APPROVED: _____
ANDREA SURRATT/JORDAN ESTES
Assistant United States Attorneys

BEFORE: THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

------------------------------------x

UNITED STATES OF AMERICA

- v. -

BRADLEY FAGAN,
   a/k/a "Wayne,"

                    Defendant.

------------------------------------x

**16 MAG 1601**

**COMPLAINT**

Violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(c)(1)(A)(i).

SOUTHERN DISTRICT OF NEW YORK, ss.:

STEVEN KAY, being duly sworn, deposes and says that he is a Special Agent of the Drug Enforcement Administration ("DEA"), and charges as follows:

## COUNT ONE
### (Conspiracy to distribute and possess with the intent to distribute narcotics)

1. From in or about November 2015 through in or about March 2016, in the Southern District of New York and elsewhere, BRADLEY FAGAN, a/k/a "Wayne," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that BRADLEY FAGAN, a/k/a "Wayne," the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

3. The controlled substance that the defendant conspired to distribute and possess with the intent to distribute was 50 grams or more of methamphetamine, its salts, isomers, and salts of isomers and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, 846.)

## COUNT TWO
### (Possession of a firearm in furtherance of a drug trafficking crime)

4. On or about March 8, 2016, in the Southern District of New York and elsewhere, BRADLEY FAGAN, a/k/a "Wayne," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the narcotics offense charged in Count One of this Complaint, knowingly did use and carry firearms, and, in furtherance of such crime, did possess firearms; to wit, a loaded 9mm Uzi and a loaded Taurus revolver.

(Title 18, United States Code, Sections 924(c)(1)(A)(i).)

The bases for my knowledge and the foregoing charges are as follows:

5. I am a Special Agent with the DEA, and I have been personally involved in the investigation of this matter. I have been a Special Agent with the DEA for approximately 9 months. My duties include investigating violations of federal narcotics laws. This affidavit is based in part upon my conversations with law enforcement agents and others and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Summary of the Investigation

6. My investigation has revealed that BRADLEY FAGAN, a/k/a "Wayne," the defendant, is a narcotics trafficker based in the New York/New Jersey area. FAGAN has sold methamphetamine to undercover officers and to his own, non-law enforcement customers on numerous occasions since November 2015.

7. Unless otherwise indicated, all of the calls and meetings described herein were recorded, and my knowledge of these calls and meetings is derived from my review of the recordings of the calls and meetings, draft transcripts of the calls and meetings, and/or my conversations with the undercover officers who participated in the calls and meetings.

### FAGAN's Sales of Methamphetamine to
### Undercover Officers in New York

8. On or about November 2, 2015, a law enforcement officer acting in an undercover capacity ("UC-1") was introduced to BRADLEY FAGAN, a/k/a "Wayne," the defendant, at a hotel in New York, New York (the "Hotel"). UC-1 was posing as a member of a biker gang who was interested in purchasing methamphetamine from FAGAN.

9. On or about November 3, 2015 BRADLEY FAGAN, a/k/a "Wayne," the defendant, agreed to meet UC-1 again at the Hotel in order to sell methamphetamine to UC-1. At this meeting:

      a. UC-1 and FAGAN discussed the sale of methamphetamine, using coded language. FAGAN then indicated that he had "it" in an envelope in his pocket. FAGAN and UC-1 then walked into the men's restroom in the lobby of the Hotel, where FAGAN handed UC-1 a white envelope. UC-1 examined the contents of the white envelope and then UC-1 handed FAGAN $1,200 and told him the substance in the white envelope looked "good."

      b. FAGAN provided UC-1 with his phone number, which ended in -7997 (the "7997 Phone") so that FAGAN and UC-1 could discuss future "crystal" transactions. Based on my training and experience and familiarity with this investigation, I know that "crystal" is often used as slang for methamphetamine.

      10. On or about November 8, 2015, UC-1 called BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, in a call that was not recorded. During this conversation, UC-1 asked FAGAN if FAGAN could meet again. FAGAN said that he could. UC-1 told FAGAN that he wanted to "double the amount," by which UC-1 meant that he wanted to purchase two ounces of methamphetamine instead of just one ounce, like on November 3, 2015. FAGAN indicated that he could do it, and agreed to meet with UC-1 later that week.

      11. On or about November 11, 2015:

      a. At approximately 10:45 a.m., BRADLEY FAGAN, a/k/a "Wayne," the defendant, using the 7997 Phone, sent UC-1 a text message asking if UC-1 wanted to meet him at the "same time today." UC-1 understood FAGAN to be asking if UC-1 was going to meet him at the same time as UC-1 and FAGAN met on November 3, 2015, which was around 1:00 p.m., and responded by text message stating, "yeah 1 right." FAGAN responded "yeah." UC-1 replied, indicating that UC-1 would meet FAGAN at a particular fast food restaurant in New York, New York (the "Restaurant").

      b. UC-1 arrived at the Restaurant at around 12:40 p.m., and noticed a blue Honda that UC-1 recognized from UC-1's work on this investigation to be FAGAN's (the "Honda"). UC-1 called FAGAN on the 7997 Phone and FAGAN confirmed that he was in the Honda. UC-1 then got into the Honda with FAGAN. FAGAN pointed to a white envelope on the center console of the Honda, which UC-1 understood to be FAGAN indicating that the methamphetamine was inside. UC-1 picked up the envelope and handed FAGAN $2,400.

      12. On or about November 24, 2015:

      a. In a call that was not recorded, UC-1 called BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone and asked FAGAN, in sum and substance, if FAGAN could meet again. FAGAN told UC-1 that he would meet UC-1 in the same place as last time, which UC-1 understood to be the Restaurant.

      b. UC-1 received a text message from FAGAN, who was using the 7997 Phone, telling UC-1 that he was at the Restaurant.

      c. UC-1 arrived at the Restaurant and noticed the Honda in the parking lot. UC-1 parked his vehicle, and then got into the Honda with FAGAN. After engaging in a brief conversation, FAGAN handed UC-1 a white envelope and in return UC-1 handed FAGAN $2,400.

13.     On or about December 10, 2015, UC-1 called BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, and asked "can we see each other tomorrow?"  FAGAN responded "yeah," and UC-1 told FAGAN "keep everything the same," by which UC-1 meant that he wanted to purchase the same amount of methamphetamine—about 2 ounces or 56 grams, see infra ¶ 31.b, 31.c—from FAGAN at the same price—$2,400—as previously on or about November 11, 2015 and November 24, 2015    FAGAN responded "ok."  UC-1 and FAGAN agreed to meet the next day in the vicinity of 34th Street and 10th Avenue in New York, New York (the "34th Street Location").

14.     On or about December 11, 2015:

    a.  UC-1 and BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was driving the Honda, met at the 34th Street Location.  UC-1 left his own vehicle and entered the Honda.  After a brief conversation, FAGAN handed UC-1 a white envelope containing two clear bags containing a crystal-like substance.  In return, UC-1 gave FAGAN $2,400.

    b.  UC-1 then asked FAGAN "do you have anybody in Tennessee?"  UC-1 explained further: "there's a chapter down there so they are looking for work."  As stated in paragraph 8 supra, UC-1, in his undercover capacity, was posing as a member of a biker gang who sold methamphetamine, so when UC-1 referred to a "chapter down there . . . looking for work" he was telling FAGAN that there was a chapter of his biker gang in Nashville looking to sell methamphetamine.  FAGAN responded that he would "love the business," meaning he would appreciate new customers for his methamphetamine.  FAGAN explained that if he did engage with UC-1's contacts in Nashville, he could "mail it," meaning send the methamphetamine via mail, rather than driving it to Nashville himself.  UC-1 gave FAGAN his purported Nashville contact's (actually another law enforcement officer acting in an undercover capacity ("UC-2")) name and phone number.[1]

15.     On or about December 30, 2015:

    a.  UC-1 received a call from BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using a phone number other than the 7997 Phone.  FAGAN told UC-1 that another individual ("CC-1") would be handling FAGAN's business while FAGAN was in Jamaica for three weeks.  FAGAN told UC-1 that this individual—CC-1—would be using the 7997 Phone in FAGAN's absence to communicate with FAGAN's customers.  UC-1 told FAGAN that he/she (UC-1) would be sending a purported associate of UC-1's (another undercover DEA agent, "UC-3") to meet with CC-1 since dealing with someone other than FAGAN made UC-1 "a little nervous."  FAGAN assented, and told UC-1 "well since I'm sending somebody you can send somebody."

    b.  CC-1 (who believed he was communicating with UC-3) used the 7997 Phone to send a text message that read "U say today," asking the individual who CC-1 believed to be UC-3 if UC-3 wanted to meet that same day.  UC-1 (pretending to be UC-3) responded: "Yeah if he can," meaning that UC-3 would like to meet CC-1 that same day if "he"—FAGAN—has methamphetamine available to see that day.  Later, CC-1 confirmed that he could meet that day,

---

[1] The details of UC-2's communications and interactions with FAGAN are outlined in paragraphs 18-25, infra.

4

and agreed via text message to meet at a location on 10th Avenue in New York, New York (the "10th Avenue Location").

  c. UC-3 parked near CC-1's vehicle at the 10th Avenue Location. UC-3 entered CC-1's vehicle and gave CC-1 $2,400, and CC-1 gave UC-3 two small clear plastic bags containing a rock-like substance.

16. On or about January 21, 2016, UC-1 called BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone and asked "can my guy come meet you tomorrow or your guy?" FAGAN told UC-1, "let me call him and see." In this call, based on UC-1's prior relationship purchasing methamphetamine from FAGAN, I believe that UC-1 was asking if his "guy"—UC-3—could meet with FAGAN or CC-1 to purchase methamphetamine. FAGAN told UC-1 that he (FAGAN) would have to call "him"—meaning CC-1—to see if CC-1 is available to meet. Later that day, FAGAN, using the 7997 Phone, called UC-1 and told UC-1 that "it's a green light," meaning that CC-1 was available to meet the next day.

17. On or about January 22, 2016:

  a. UC-3 received a text message from BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, informing UC-3 that CC-1 was on a particular street, across from a fast food restaurant parking lot in New York, New York (the "Street Location").

  b. UC-3 drove to the Street Location and parked behind what UC-3 recognized as CC-1's vehicle. UC-3 exited his (UC-3's) vehicle and entered CC-1's. UC-3 gave CC-1 $2,400 and CC-1 gave UC-3 a black plastic bag containing two Ziploc bags, each containing a crystal-like substance.

### FAGAN's Sales of Methamphetamine to an Undercover Officer in Nashville, Tennessee

18. On or about December 16, 2015:

  a. UC-2—who, as described in paragraph 14.b, supra, is an undercover officer posing as UC-1's contact in Nashville, Tennessee—received a call from BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone. During this call, FAGAN introduced himself as "Wayne," and stated that he was given the number by the first name that UC-1 was using in UC-1's communications with FAGAN. UC-2 told FAGAN that UC-2 would call FAGAN back.

  b. Later, UC-2 called FAGAN back at the 7997 Phone. During this conversation, FAGAN agreed to send UC-2 one ounce of methamphetamine through the mail for $1,100. FAGAN told UC-2 to text him an address (to which UC-2 could send the drugs). UC-2 asked about FAGAN's ability to supply "pounds of that stuff," and FAGAN replied that "as long as I got what you want, no problem for me to give it you."

  c. UC-2 sent a text message to FAGAN at the 7997 Phone, providing FAGAN with an address in Nashville, Tennessee (the "First Nashville Address").

19.  On or about December 17, 2015, BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, texted UC-2 the word "Tracking" followed by a long string of numbers which appeared to UC-2 to be a U.S. Postal Service tracking number (the "First Tracking Number").  UC-2 texted in reply: "What delivery service," and shortly thereafter, FAGAN sent UC-2 a text that said "USPS."

20.  On or about December 20, 2015, BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, sent UC-2 a text that said "Florence Hall Account" followed by a string of numbers which appeared to UC-2 to be a bank account number (the "First Bank Account Number").  UC-2 responded to the text, asking if it was a Bank of America account.  FAGAN, using the 7997 Phone, replied: "Yes."

21.  On or about December 21, 2015:

  a. BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, sent UC-2 a text that said "Look for a big envelope."

  b. UC-2 and another DEA agent picked up a package from the First Nashville Address bearing the First Tracking Number.  The package contained a substance that, based on UC-2's training and experience, resembled methamphetamine.  UC-2 sent FAGAN, who was using the 7997 Phone, a text that said: "Got it. looks good. will deposit $ in the morning."

22.  On or about December 22, 2015, UC-2 transferred $1,100 to the Bank of America account bearing the First Bank Account Number.  Shortly thereafter, UC-2 received a text from BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, stating: "Yeah it's good," which UC-2 understood to mean that FAGAN had received the money.

23.  On December 22, 2015 and December 23, 2015, UC-2 and BRADLEY FAGAN, a/k/a "Wayne," the defendant, who was using the 7997 Phone, exchanged text messages as follows:

| | |
|---|---|
| UC-2: | Got good reviews and went fast.  talk soon…going to need more |
| FAGAN: | Ok we do the same…let me know how many so I can put it together |
| UC-2: | How much for a half pound? |
| FAGAN: | $8,000 |
| UC-2: | go ahead and send it.  we need it. |
| FAGAN: | Ok cool |

Based on my training and experience and familiarity with this investigation, in this exchange, it appeared to me that UC-2 was telling FAGAN that the methamphetamine that FAGAN mailed to UC-2 was of good quality and sold quickly and, accordingly, UC-2 wished to purchase more.  FAGAN agreed, and asked UC-2 how much more methamphetamine UC-2 wanted to buy, to which UC-2 responded that he/she wanted to purchase ½ pound of methamphetamine.  FAGAN agreed to sell that amount to UC-2 for $8,000.

24.  Subsequent to the exchange of text messages reproduced at paragraph 23, supra, UC-2 provided BRADLEY FAGAN, a/k/a "Wayne," the defendant, via text message sent to the

7997 Phone, with a new address in Nashville to which UC-2 wanted FAGAN to send the ½ pound of methamphetamine (the "Second Nashville Address"). FAGAN agreed to sell the drugs, and sent UC-2 a text containing what UC-2 believed to be another USPS tracking number, preceded by the words "USPS Tracking." (the "Second Tracking Number"). UC-2 asked FAGAN, by text message, "okay. you going to want the $ put in the same account?" FAGAN replied, instructing UC-2 to deposit $4,000 into the bank account bearing the First Bank Account Number, and $4,000 into a second Bank of America account. UC-2 subsequently deposited a total of $8,000 into these two accounts.

25. On or about December 28, 2015, UC-2 and another DEA agent picked up a package bearing the Second Tracking Number from the Second Nashville Address. The package contained a substance that, based on UC-2's training and experience, resembled methamphetamine. The package had a return address in Maplewood, New Jersey.

### The Title III and FAGAN's Sales of Methamphetamine to CC-2

26. On or about February 2, 2016, the Honorable Lewis A. Kaplan signed an order authorizing the interception of wire and electronic communications over the 7997 Phone. Agents began intercepting communications on February 3, 2016. I have reviewed recordings and draft transcripts (including draft translations of the calls that were not in English) of the intercepted communications. Based on my review of the intercepted communications, some of which are discussed below, and my training and experience and familiarity with this investigation, it appeared to me that BRADLEY FAGAN, a/k/a "Wayne," the defendant, has been using the 7997 Phone to engage in discussions about narcotics trafficking and arrange to buy and sell methamphetamine, among other drugs.

27. For instance, on or about February 7, 2016, another co-conspirator of BRADLEY FAGAN, a/k/a "Wayne," the defendant, ("CC-2") placed numerous calls to FAGAN which were intercepted over the 7997 Phone. During two of these intercepted communications, the following conversations, in sum and substance and in part, took place:

Session 158

CC-2      ... [Y]ou are more than welcome to come in for a...I mean, they have having a big party. . . . I am bringing my girlfriend, but, like I said, she can be inside . . . there is a window for you if you come out like between 7, 6:30. Till nine, till nine, I will be there. You call, I just shoot out and um, yeah. Whatever, I mean, you don't have to meet my girlfriend, so . . . you don't have to do that you know.

FAGAN      Yeah.

CC-2      I mean, I would not mind you meeting my girlfriend, but you know . . . it's or you wanted to [u/i] you want to push it to another day in the week when it's less people there; we can do that too. I'm guaranteeing you, I'm, I'm up for one case. What to see what it is.

7

| | |
|---|---|
| FAGAN | Uh hum. |
| CC-2 | If I like it, I'm grabbing more of course. . . . |

Session 171

| | |
|---|---|
| CC-2 | Hey buddy. What's happening. You, you wanna…are we doing this tonight, or you want to skip? |
| FAGAN | No man. I am on my way. |
| CC-2 | Okay. No, no, no, no. I am not pressuring you. I am just…I didn't know, you know. No big deal you know. You know how you really is. |
| FAGAN | Yeah. |
| CC-2 | Take your time. |
| FAGAN | Yeah. |
| CC-2 | I am here. Don't, don't rush. |
| FAGAN | Yeah man. I am on my way, man. Okay? |

Based on my training and experience, familiarity with the investigation, as well as my review of the intercepted calls, it appears to me that, in these calls on February 7, 2016, CC-2 and FAGAN agreed to meet so that FAGAN could sell CC-2 one ounce of methamphetamine. In the first call of the series, session #158, CC-2 described how he is going to be at a party—which I believe to be a Super Bowl party since the calls took place on Super Bowl Sunday and because one of the calls also contained a reference to football—and told FAGAN that he was "up for one case," which appears to me to be a coded reference to one ounce of methamphetamine. CC-2 explained to FAGAN that even though CC-2's girlfriend was going to be at the party, FAGAN could call CC-2 and CC-2 could leave the party to meet FAGAN so FAGAN would not have to interact with CC-2's girlfriend ("I just shoot out and um, yeah. Whatever, I mean, you don't have to meet my girlfriend.").

In session #171, CC-2 called FAGAN again asking if FAGAN was still planning on coming to the party to sell methamphetamine to CC-2 ("You, you wanna…are we doing this tonight, or you want to skip?"). FAGAN indicated to CC-2 that he still wanted to do the drug deal and was on his way to the Super Bowl party to sell CC-2 at least one ounce of methamphetamine.

28. On or about February 14, 2016, CC-2 and BRADLEY FAGAN, a/k/a "Wayne," the defendant, exchanged a series of text messages, which were intercepted over the 7997 Phone:

| | |
|---|---|
| CC-2 | Cant shake my girl today monday works |
| FAGAN | Cool man |

8

CC-2             Yes just let me know what time

29.     Also on or about February 14, 2016, CC-2 called BRADLEY FAGAN, a/k/a "Wayne," the defendant, in a call that was intercepted on the 7997 Phone. During this call, the following conversation occurred, in substance and in part:

CC-2             Alright man . . . I can meet you at 10:00 tomorrow morning ah…could we meet? I'm all set um…maybe give me a little bit of a break, like 1150 possibly and then ah…but I'm going to run…I've got those guys set up for 11:00, so. I'm ah give you ah…[does] that work?

FAGAN            Yeah. So what you said ah, just one?

CC-2             I'll…I'll be ah…just one for now. Listen I'm going to try to put them in ah…you know where I'll have to do this so many times a month…[u/i] you know. I'd like to see them once a month not…not four times a month. So we're going to work on that. Okay so help me out with my number a little bit. But I'll see you tomorrow at 10.

Based on my training and experience and familiarity with this investigation, in these February 14, 2016 text messages and phone call between CC-2 and FAGAN, it appeared to me that FAGAN was agreeing to sell CC-2 one ounce of methamphetamine ("just one for now"). CC-2 asked FAGAN if FAGAN could give CC-2 a "break" on the price, and specifically asked FAGAN to sell him the drugs for $1,150 for the one ounce. FAGAN and CC-2 agreed to meet at 10:00 a.m. the following day.

30.     The following day, on or about February 15, 2016:

a.      Other DEA agents and I arrived in the vicinity of a residence in New Jersey where, I believe from my work on this investigation, BRADLEY FAGAN, a/k/a "Wayne," the defendant, lives (the "Fagan Residence"), to conduct surveillance. At approximately 9:35 a.m., agents intercepted a call on the 7997 Phone in which CC-2 told FAGAN that he (CC-2) would meet FAGAN "[a]t point at 10:15 a.m." At approximately 9:50 a.m., I saw FAGAN leave the parking lot behind the Fagan Residence in his Honda. At approximately 10:05 a.m., I saw FAGAN's Honda park in front of a restaurant in Orange, New Jersey. At approximately 10:15 a.m., I saw a silver Mini Cooper park directly behind FAGAN (the "Mini Cooper"). I saw CC-2 get out of the Mini Cooper and enter FAGAN's Honda. CC-2 exited the Honda approximately five minutes later and got back into his Mini Cooper and drove away.

b.      Other agents and I followed the Mini Cooper for approximately five minutes and then pulled the car over in New Jersey. Another agent and I searched CC-2's Mini Cooper and located a clear/white rock-like substance that appeared to me to be methamphetamine inside of a glove inside of the Mini Cooper's glove compartment. The other agent and I seized the drugs and

then let CC-2 go without arresting him.[2]

c. Based on my training and experience and familiarity with this investigation—and in particular, FAGAN's interactions with UC-1 and UC-3 in which FAGAN sold UC-1 and UC-3 methamphetamine out of the Honda—I believe that on February 15, 2016, FAGAN brought methamphetamine he had stored at the Fagan Residence to sell to CC-2.

### The Seized Substances Tested Positive for Methamphetamine

31. The substances that UC-1 and UC-3 acquired from BRADLEY FAGAN, a/k/a "Wayne," the defendant, have been field-tested and weighed. I have reviewed reports resulting from the tests of these substances, and have learned the following:

a. The substance UC-1 acquired from FAGAN on November 3, 2015, weighed approximately 28 grams and tested positive for methamphetamine.

b. The substance UC-1 acquired from FAGAN on November 11, 2015, weighed approximately 56 grams and tested positive for methamphetamine.

c. The substance UC-1 acquired from FAGAN on November 24, 2015, weighed approximately 56 grams and tested positive for methamphetamine.

d. The substance UC-1 acquired from FAGAN on December 11, 2015, weighed approximately 56 grams and tested positive for methamphetamine.

e. The substance UC-2 acquired from FAGAN through the mail on December 21, 2015, weighed approximately 28 grams and tested positive for methamphetamine.

f. The substance UC-2 acquired from FAGAN through the mail on December 28, 2015, weighed approximately ½ pound (or around 450 grams) and tested positive for methamphetamine.

32. The substances that UC-3 acquired from CC-1 have been tested and weighed by a DEA laboratory. I have reviewed reports resulting from the tests of these substances, and have learned the following:

a. The substance UC-3 acquired from CC-1 on December 30, 2015, weighed approximately 55.9 grams and tested positive for methamphetamine that was 94.9% pure.

b. The substance UC-3 acquired from CC-1 on January 22, 2016, weighed approximately 55.8 grams and tested positive for methamphetamine that was 95.4% pure.

33. The substance that other agents and I seized from CC-2's Mini Cooper on or about February 15, 2016 has been tested and weighed by a DEA laboratory. I have reviewed a report resulting from the test of this substance and learned that the substance weighed approximately 27.8

---

[2] Subsequent phone calls between FAGAN and CC-2 intercepted over the 7997 Phone suggest that CC-2 did not believe that he was stopped by police, but instead suspects that he was robbed of the methamphetamine.

grams and tested positive for methamphetamine that was 89.9% pure.

## Search of FAGAN's Property

34.     On or about March 8, 2016, other law enforcement officers searched the Fagan Residence pursuant to a judicially-authorized search warrant. I have spoken with one of those officers ("Officer-1"). Among other things, at the Fagan Residence, Officer-1 and the other officers located:

   a. A loaded 9mm Uzi, in a bag under the bed in the bedroom.

   b. A loaded Taurus .38 revolver, under the mattress in the bedroom.

   c. A machete under the couch in the living room.

   d. A substance that appeared, in Officer-1's training and experience, to be approximately one pound of methamphetamine, on the dining room table alongside baggies and scales used, in Officer-1's training and experience, to package narcotics for sale. Additional methamphetamine was also located in other areas of the Fagan Residence, such as in the living room.

   e. A substance that appeared, in Officer-1's training and experience, to be approximately 50 pounds of marijuana, in various places in the Fagan Residence, such as in the closet, the living room, and in a bag behind the fireplace.

WHEREFORE, your deponent respectfully requests that BRADLEY FAGAN, a/k/a "Wayne," the defendant, be imprisoned, or bailed, as the case may be.

_____
Steven Kay
Special Agent
Drug Enforcement Administration

Sworn to before me this
9th day of March, 2016

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11